# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| DESIGN BASICS LLC and<br>PLAN PROS, INC.,<br><br>                       Plaintiffs,<br>v.<br><br>J & V ROBERTS INVESTMENTS, INC.<br>d/b/a ROBERTS HOMES & REAL ESTATE,<br>and JAMES A. ROBERTS, d/b/a ROBERTS<br>HOMES & REAL ESTATE,<br><br>                       Defendants,<br><br>WILSON MUTUAL INSURANCE<br>COMPANY and ACUITY A MUTUAL<br>INSURANCE COMPANY,<br><br>                       Intervenors. | Case No. 14-CV-1083-JPS<br><br><br><br><br><br><br><br><br>ORDER |

In this civil suit, filed on September 3, 2014, Plaintiffs, Design Basics LLC ("Design Basics") and Plan Pros, Inc. ("Plan Pros") (collectively, "the plaintiffs"), allege causes of action for both non-willful and willful violations of the Copyright Act, 17 U.S.C. § 106, and violations of the Digital Millennium Copyright Act, 17 U.S.C. § 1202, against Defendant J & V Roberts Investments, Inc. ("J & V Roberts") and Defendant James A. Roberts (collectively "the defendants"). (Docket #1).[1] The Court granted Wilson Mutual Insurance Company ("Wilson Mutual") and ACUITY a Mutual Insurance Company ("ACUITY") permission to intervene in this action. (Docket #19, #34).

---

[1] On March 9, 2015, the Court granted the plaintiffs' unopposed motion to dismiss defendants Debra Heller, Vicki Roberts, Jeffrey C. Alexander and Sandra A. Colwin with prejudice and without costs to any party. (Docket #29).

On June 1, 2015, the defendants filed a Motion for Summary Judgment. (Docket #45), Wilson Mutual filed a Motion for Summary Judgment and Declaratory Judgment (Docket #42), and ACUITY filed a Motion for Summary Judgment (Docket #51). The motions are now fully briefed and ready for disposition.[2] As discussed below, the Court will deny the defendants' motion; grant in part and deny in part Wilson Mutual's motion; and grant ACUITY's motion, as more fully described below.

1.      FACTUAL BACKGROUND[3]

1.1.    The Parties

The plaintiffs are engaged in the business of creating publishing and licensing architectural plans and designs, with their principal offices located in Omaha, Nebraska. (PPFF ¶¶ 1-2). The defendants are in the business of marketing, constructing and selling residential homes. (DPFF ¶ 2). James Roberts owns J & V Roberts Investments, Inc., which does business as Roberts Homes & Real Estate; Mr. Roberts opened this company in or about 1989. (DPFF ¶ 1). Intervenors, ACUITY and Wilson Mutual, issued various insurance policies to the defendant that are relevant to this action.

---

[2]The defendants' reply argues that the Court should not consider the plaintiffs' opposition materials because they were filed untimely. (Defs' Reply at 1, Docket #68). Defendants filed their motion for summary judgment on June 1, 2015. (Docket #45). The plaintiffs filed their opposition materials on July 6, 2015. As such, the plaintiffs submissions were not untimely. *See* Civil L.R. 56(b)(2); Fed. R. Civ. P. 6(a)(1)(C); Fed. R. Civ. P. 6(d).

[3]The cited facts are from the parties' proposed findings of fact, unless otherwise indicated. The Court will cite to the defendants' Proposed Findings of Fact (Docket #46) as "DPFF." The Court will cite to the plaintiff's Proposed Findings of Fact (Docket #67) as "PPFF." To avoid any confusion, the Court will cite to Wilson Mutual's Proposed Findings of Fact (Docket #44) as "Wilson PFF" and ACUITY's Proposed Findings of Fact (Docket #52) as "ACUITY PFF." Unless otherwise indicated, the proposed findings to which the Court cites are undisputed.

1.2    Alleged Infringement[4]

The plaintiffs' infringement claims in this case revolve around eight copyrighted architectural plans. Specifically, the eight (8) plans at issue are registered with the U.S. Copyright Office under copyright registration numbers VA 467-641 (hereinafter the "Adair" plan), VA 485-069 (hereinafter the "Waverly" plan), VA 778-706 (hereinafter the "Thomasville" plan), VA 1-070-137 (hereinafter the "Millington" plan), VA 467-639 (hereinafter the "Prairie" plan), VA 542-684 (hereinafter the "Avery" plan), VA 434-184 (hereinafter the "Fenton" plan), and VA 1-412-561 (hereinafter the "McClover" plan) (collectively, the "Copyrighted Works"). All of the Copyrighted Works were registered prior to their first publication. (PPFF ¶ 5). The defendants did not receive a license or authorization from the plaintiffs for the "Adair," "Waverly," "Thomasville," "Millington," "Prairie," "Avery," "Fenton," or "McClover" plans. (PPFF ¶ 7).

Between 1989 and approximately mid-2009, J & V Roberts was a licensed dealer of a business called Wausau Homes.[5] All of the homes built by J & V Roberts during those years were based upon licensed plans received

---

[4]The defendants appear to misunderstand the meaning and use of "undisputed facts" for the purposes of summary judgment. For example, the defendants list as an undisputed fact that they did not infringe on the plaintiffs' designs because the eight plans were either licensed to J & V Roberts with permission to use them or designed specifically for them by independent contractors. (*See* DPFF ¶ 9). This, of course, is the central issue in the case, and is clearly disputed by the plaintiffs. (*See* Pl's Response DPFF ¶ 9). A fact is not undisputed merely because a party says so.

[5]The parties provide no specific information about Wausau Homes. The Court presumes it is a business that creates and/or licenses architecture plans.

Case 2:14-cv-01083-JPS    Filed 09/11/15    Page 3 of 38    Document 83

from Wausau Homes.[6] J & V Roberts had a license from Wausau Homes to build one of the allegedly infringing plans at issue in this case, the "Brookhaven" plan. (DPFF ¶ 4). As to the other seven plans at issue, the defendants allege that the home plans titled "Fox Hollow," "Wilshire," "RiverRidge," "Shadow Glen," and "Fairwind" were all designed for J & V Roberts for J & V Roberts' use by independent contractors who were retained in or about 2009. (DPFF ¶ 5). The defendants further allege that the home plans titled "Pattison" and "Havenwood" were designed by Scott Stallmacher for J & V Roberts' use; Scott Stallmacher was retained as an independent contractor in or about 2009. (DPFF ¶ 6).[7]

Plaintiffs claim the defendants have infringed on copyrights in the subject plans as far back as August 2002. (DPFF ¶ 11). The plaintiffs allege the following copyright violations:

(1)     Design Basic's "Adair"—infringed by the defendants' "Fox Hollow";

(2)     Design Basic's "Waverly"—infringed by the defendants' "Wilshire";

(3)     Design Basic's "Thomasville"—infringed by the defendants' "River Ridge";

(4)     Design Basic's "Millington"—infringed by the defendants' "Pattison";

(5)     Design Basic's "Prairie"— infringed by the defendants' "Havenwood";

(6)     Design Basic's "Avery"—infringed by the defendants' "Shadow Glen";

(7)     Design Basic's "Fenton"—infringed by the defendants' "Brookhaven"; and

(8)     Plan Pro's "McClover"—infringed by the defendants' "Fairwind."

---

[6] The Court notes that the plaintiffs dispute this fact in terms of the validity of the licenses. (Pl's Response DPFF ¶ 3). They do not, however, appear to contest the mere fact that the defendants had the licenses.

[7] Again, the plaintiffs clearly dispute this fact as they argue that the defendants copied their designs and did not independently create them.

Case 2:14-cv-01083-JPS    Filed 09/11/15    Page 4 of 38    Document 83

(*See* DPFF ¶¶ 4-6).

All of the works contained within the plaintiffs' home design catalogs, as well as all the works contained on the plaintiffs' website, http://www.designbasics.com, display Plaintiffs' copyright management information, ensuring that all customers and potential customers know that Plaintiffs' own all rights and title to their copyrighted plans. (PPFF ¶¶ 1, 7)

The plaintiffs allege that they first became aware that the defendants had violated their copyrights on September 10, 2011, when Mr. Cuozzo, an employee of the plaintiffs, discovered the activity. (PPFF ¶ 21). J & V Roberts posted the plans that allegedly infringe the plaintiffs' designs on the J & V Roberts website with J & V Roberts' logo, "Roberts Homes and Real Estate" prominently displayed in the upper-left corner of each plan page. (PPFF ¶ 23). The last page of J & V Roberts' Floor Plan Book bore the notation "All Plans in this book are the property of Roberts Homes, Custom View Design, and Stelmacher Architecture and are copyrighted as such." (PPFF ¶ 23).

### 1.3 Relevant Insurance Policies

Wilson Mutual Insurance Company issued the following policies to the various defendants: (1) Contractors policy issued to Roberts Homes & Real Estate ("Roberts Homes") and J & V Roberts Investments, Inc., from April 27, 2005, to April 27, 2010, Policy No. BC170885; (2) Businessowners policy issued to J & V Roberts Investments, Inc., and/or James and Vicki Roberts from April 27, 2009, to April 27, 2013, Policy No. BP232353; (3) Commercial umbrella policy issued to Roberts Homes and J & V Roberts Investments, Inc., from April 27, 2005, to April 27, 2010, Policy No. CU170883; (4) Business Insurance policies issued to J & V Roberts Investments, Inc., and/or James and Vicki Roberts from April 27, 2011, to April 27, 2015, Policy No. 3200254260; (5) Commercial Package Policy issued

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 5 of 38   Document 83

to Roberts Homes, J & V Roberts Investments, Inc., and James and Vicki Roberts from April 27, 2005, to April 27, 2009, Policy No. CP170882. (Wilson PFF ¶ 12).

ACUITY issued a policy of insurance to "J & V Roberts Inc." containing Commercial General Liability ("CGL") Forms and Commercial Excess Liability ("Excess") Forms under Policy No. F72223 during the policy term of: 4/27/01-4/27/02; 4/27/02-4/27/03; 4/27/03-4/27/04; and 4/27/04 to 4/27/05. (ACUITY PFF ¶ 22). Additional named insureds on the policy are James & Vicki Roberts and J & V Electric Inc. (ACUITY PFF ¶ 23). ACUITY has agreed to assume the defense of J & V Roberts Investments, Inc., d/b/a Roberts Homes & Real Estate and James A. Roberts d/b/a Roberts Homes & Real Estate under a reservation of rights. (ACUITY PFF ¶ 24).

2.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

On summary judgment, courts must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). Additionally, "[o]n summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson,* 477 U.S. at 248.

3.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants' motion for summary judgment argues that: (1) as a matter of law, the plaintiffs cannot prove all of the prerequisites of a copyright infringement claim; and (2) alternatively, that any claims for infringements occurring prior to September 3, 2011, are barred by the statute of limitations. The plaintiffs oppose all aspects of the summary judgment motion, arguing specifically that the evidence shows all necessary elements of the copyright claims and that their claims are not barred by the statute of limitations in accordance with the law of the Seventh Circuit. As discussed in detail below, the Court finds that: (1) material issues of fact preclude summary judgment on the copyright claims; and (2) that the plaintiffs' claims

accruing prior to September 3, 2011, are not barred by the statute of limitations because the discovery rule applies to copyright actions in this circuit.

### 3.1    Legal Standard—Copyright Infringement

The Copyright Act, 17 U.S.C. §§ 101 *et seq.*, provides a non-exhaustive list of categories of artistic works for which protection is available. The statute lists, for example, "sound recordings," "pantomimes and choreographic works," "pictorial, graphic and sculptural works," and "literary works." 17 U.S.C. § 102(a). When Congress passed the Copyright Act of 1976, architectural works were not among the listed categories, and it was not clear to what extent buildings or architectural plans could be copyrighted. William F. Patry, 2 Patry on Copyright § 3:109 (2014). In the 1980s, however, Congress started the lengthy process of updating the Copyright Act in order to join the Berne Convention, an international agreement that governs copyright protection. *See generally* 7 Patry on Copyright § 23:45. Among other things, the Berne Convention requires signatory nations to protect architectural works. *See* 2 Patry on Copyright § 3:107. Thus, to join the Berne Convention, the United States was compelled to clarify that architectural works are protectable under federal law. *Id.* To this end, Congress passed the Architectural Works Copyright Protection Act ("AWCPA") of 1990 and added "architectural works" to the list of protectable material. *Id.*

"To establish copyright infringement, [a party] must prove two elements: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007) (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co., Inc.,* 499 U.S. 340, 361 (1991)). The owner of a copyright may obtain a

Case 2:14-cv-01083-JPS    Filed 09/11/15    Page 8 of 38    Document 83

certificate of copyright, which is "prima facie evidence" of its validity. 17 U.S.C. § 410(c). For purposes of this motion, the defendants do not dispute that the plaintiffs own valid copyrights in the subject plans (Def. Opening Br. at 4, Docket #46); thus, the Court need not address the issue.[8]

As to the second element, copying can be proven by direct evidence, but that is "often hard to come by." *JCW Invs.,* 482 F.3d at 915. Because "plagiarists rarely work in the open and direct proof of actual copying is seldom available," *Johnson v. Gordon*, 409 F.3d 12, 18 (1st Cir. 2005), the second method of proof is used most commonly. In the alternative, copying may be "inferred 'where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'" *JCW Invs.,* 482 F.3d at 915. (citations omitted).

Access is shown where the defendant had an opportunity to view the copyrighted item. *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 508 n.5 (7th Cir. 1994). "It is not essential to prove access, however." *JCW Invs.,* 482 F.3d at 915. If "'two works are so similar as to make it highly probable that the later one is a copy of the earlier one, the issue of access need not be addressed separately…'" *Id.* (quoting *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1170 (7th Cir. 1997)).

As to the question of substantial similarity, the Seventh Circuit applies the "ordinary observer test: 'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiffs' protectable expression by taking material of substance and value.'" *Wildlife Exp. Corp.,* 18 F.3d at 509 (quoting *Atari Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614

_____

[8]The plaintiffs filed certificates of copyright with their pleadings (Docket #1).

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 9 of 38   Document 83

(7th Cir. 1982) (*superseded by statute on other grounds as recognized in Scandia Down Corp. v. Euroquilt Inc.,* 772 F.2d 1423, 1429 (7th Cir. 1985)).

### 3.2    Analysis

As noted above, the defendants do not dispute the validity of the plaintiffs' copyrights for the purposes of summary judgment. Thus, the Court's analysis focuses solely on the second prong of the copyright inquiry: whether the plaintiffs can prove "'copying of constituent elements of the work that are original.'" *JCW Invs.,* 482 F.3d at 914 (quoting *Feist,* 499 U.S. at 361). This inquiry, however, is much more nuanced to answer than the question suggests. The plaintiffs have not offered any direct evidence of copying, so the Court must use the second method of proof; the Court may infer copying through proof of: (1) access; and (2) that the accused work is substantially similar to the copyrighted work. *Id.* The Court now turns to discuss each of these elements separately.

#### 3.2.1    Access

The defendants argue that the plaintiffs can "only speculate or conjecture as to whether J & V Roberts had access to the copyrighted plans." (Defs' Opening Br. at 6, Docket #46). The plaintiffs argue there is "abundant evidence" of access here because they received dozens of its home plan catalogs, and regularly conducted business with the plaintiffs over the last twelve years. (Pl's Opp. at 7, Docket #65).

To prove access, the plaintiff must offer evidence that the defendant had an opportunity to view the copyrighted work. *Wildlife Express,* 18 F.3d at 508 n.5. Additionally, access may be inferred under certain circumstances, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 926 (7th Cir. 2003) (proof of access not required when similarities between copyrighted work

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 10 of 38   Document 83

and its accused infringer concern details of such arbitrary character that probability of independent duplication is remote).

Here, the plaintiffs allege access because they have conducted business with the defendants for the past twelve years. The plaintiffs allege that defendants ordered twenty-four home plan catalogs from the plaintiffs. (Pls' Opp. at 8, Docket #65). The defendants, in turn, argue that the plaintiffs grossly mischaracterize the evidence and that they never ordered any of the plaintiffs catalogs. Instead, the defendants argue that any sent catalogues were unsolicited and, therefore, do not prove access. (Defs' Reply at 4-5, Docket #68).

The Court finds that material issues of fact exist as to the access issue. First, there seem to be factual issues as to whether the defendants actually received and viewed any of the twenty-four catalogues allegedly sent to the defendants. Second, as discussed below, there are questions of material fact as to how similar the accused works are to the plaintiffs' designs, which in turn will affect the question of whether proof of access is even required. *See Bucklew*, 329 F.3d at 926 . In sum, at the very least, the plaintiffs have shown that it was at least reasonably possible that the paths of the defendants' and the plaintiffs' work crossed. As such, the defendants are not entitled to summary judgment on the access prong. The Court now turns to address the more complicated issue of substantial similarity.

### 3.2.2   Substantial Similarity and Wrongful Copying

The defendants do not dispute that there are various similarities between their architectural works and the plaintiffs' works. They maintain, however, that the plaintiffs' copyrights do not cover the architectural works in their entirety, but rather only certain limited creative contributions that the plaintiffs made. The defendants argue that any similarities between their

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 11 of 38   Document 83

designs and the plaintiffs' relate only to noncopyrightable subject matter. As such, the defendants conclude that they are entitled to summary judgment because the accused plans are not substantially similar to the copyrighted plans. (Defs' Opening Br. at 9-11, Docket #46). In contrast, the plaintiffs point to evidence showing all of the similarities between their copyrighted works and the accused works. The plaintiffs argue that, in light of those similarities, material issues of fact exist to preclude summary judgement on the issue of substantial similarity. (Pls' Opp. at 16, Docket #65).

The substantial similarity inquiry consists of two steps: (1) identifying which aspects of an artist's work, if any, are protectable by copyright; and (2) determining whether the allegedly infringing work is "substantially similar" to protectable elements of the artist's work. In conducting this inquiry, the Court keeps in mind that "[w]here reasonable minds could differ on the issue of substantial similarity…summary judgment is improper." *Cavalier v. Random House, Inc.,* 259 F.3d 97, 112 (1st Cir. 2006); *accord Atkins v. Fischer*, 331 F.3d 988, 995 (D.C. Cir. 2003) (citing *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C. Cir. 2002) ("This issue of substantial similarity in a copyright infringement case 'is customarily an extremely close question of fact,' as to which 'summary judgment has traditionally been frowned upon.'").

### 3.2.2.1   Scope of the Copyright Protection

The issue of copyrightability, at least in this Circuit, is a question of law (albeit one that is fact-specific) to be determined by the court. *See Gaiman v. McFarlane*, 360 F.3d 644, 648–49 (7th Cir. 2004); *Publ'ns Int'l, Ltd. v. Meredith Corp.*, 88 F.3d 473, 478 (7th Cir. 1996); *see also, Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 34 n. 5 (1st Cir. 2001) (cited with approval in *Gaiman*).

The fact that a work is copyrightable "says very little about the scope of its protection." *Atari, Inc.*, 672 F.2d at 616–17.

A fundamental rule of copyright law is that it protects only "original works of authorship," those aspects of the work that originate with the author himself. 17 U.S.C. § 102(a). Everything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to draw upon. *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 102 (2d Cir. 2014). It is the peculiar expressions of that history, those facts, and those ideas that belong exclusively to their author. *See* 17 U.S.C. § 102(b). For example, "[a]ny artist may portray the Spanish Civil War, but no one may paint another Guernica. And anyone may draw a cartoon mouse, but there can be only one Mickey." *Zalewski,* 754 F.3d at 102.

"Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity." *Feist Publ'ns*, 499 U.S. at 345 (citing 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990) (hereinafter "Nimmer")). "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.* (quoting Nimmer at § 1.08[C][1] ).

The central question of this case is how to apply these and related doctrines to separate the protectable from the unprotectable in architectural works. Although no bright line rule delineates the scope of what may be copyrighted, 17 U.S.C. § 101 provides some guidance regarding the scope of copyrights pertaining to architectural works. These works are defined by statute to include:

the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101.

Nonetheless, there are many aspects of architectural plans that are *not* copyrightable because they lack originality. For example, efficiency is an important architectural concern that courts have found to receive no protection. *Zalewski,* 754 F.3d at 105. Thus, any design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity should get no protection. *Id.* Likewise, "[d]esign features used by all architects, because of consumer demand, also get no protection." *Id.* Indeed, the plaintiff "can get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen." *Zalewski,* 754 F.3d at 106.

Courts have also imported concepts from other copyrightable works into the architecture sphere. For instance, "scenes a faire," defined as "thematic concepts or schemes" that are not original to the author, *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976), and "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," play a role in which elements of a work are protectable by copyright. *Atari, Inc.,* 672 F.2d at 616. The idea of scenes a faire "has been most commonly employed in the literary or dramatic context," *see Southco, Inc. v. Kanebridge Corp.*, 390 F.3d 276, 287 (3d Cir. 2004), but the concept has been applied in cases involving computer software copyrightability and audiovisual games. *Autoskill*, 994 F.2d at 1494 (holding

that items which necessarily follow from a given theme or setting must be filtered from the court's infringement analysis).

Important to this case, the Second Circuit recently applied "scenes a faire" to an architectural design by analogy.[9] In *Zalewski,* the court recognized the unoriginality in certain styles of architecture, such as neoclassical government buildings, colonial houses, and modern high-rise office buildings. 754 F.3d at 105; *see also Sturdza v. United Arab Emirates,* 281 F.3d 1287, 1295–96 (D.C. Cir. 2002) (holding that that "scenes a faire" must be excluded as unprotectable elements where copyrightability of an embassy design was at issue).

Conversely, what can be afforded copyright protection, as relevant here, is that the particular selection, arrangement, and combination of individual elements in one house may be sufficiently original and detailed to be afforded copyright protection. *See* 17 U.S.C. § 101; *see also Zalewski,* 754 F.3d at 107; *Frank Betz Assoc., Inc. v. J.O. Clark Const., LLC,* No. 3:08-CV-159, 2010 WL 4628203 at *5 (M.D. Tenn. November 5, 2010) (citing cases) ("In the case of more mundane residential designs, it is obvious that the use of porches, porticos, dormers, and bay windows, for example, is not protected, but the particular expression of those ideas, and their combination in one house, may be protected."); *T–Peg, Inc. v. Vt. Timber Works, Inc.,* No. 03–CV–462–SM, 2009 WL 839522 at *3 (D.N.H. Mar. 27, 2009) (holding that after filtering out unprotectable architectural elements, "the overall

---

[9]The Court looks to *Zalewski* as persuasive authority for three reasons: (1) a lack of Seventh Circuit cases analyzing copyright infringement specifically in the context of architecture designs; (2) both parties rely on the case; and (3) the decision is well-reasoned and applicable to this case.

arrangement and composition of spaces and elements" must still be considered).

In applying these concepts to the present case, the Court finds that the plaintiffs' designs at issue contain some modicum of originality that is protectable. To be sure, these are not architecture designs for the Sagrada Familia or the Taj Mahal, and originality is limited. However, the Court nonetheless finds that amidst the various unprotectable elements present in the plaintiffs' designs, the particular selection, arrangement, and combination of individual elements contains originality so as to warrant copyright protection. The Court now turns to the issue of wrongful copying.

### 3.2.2.2 Wrongful Copying

The second step of the substantial similarity analysis involves determining whether the allegedly infringing work is substantially similar to protectable elements of the artist's work. In the process of determining whether the plaintiffs' work is copyrightable, the Court filtered out the non-protectable portions of the plaintiffs' work. To determine whether the defendants' designs infringe on the Plaintiffs' work, the protectable elements of the Plaintiffs' work must be compared to the defendant's designs. *See Zalewski,* 754 F.3d at 101 ("When an original work contains many *un* protected elements, however, a close similarity between it and a copy may prove only copying, not wrongful copying.")

The defendants argue that the similarities with the plaintiffs' designs include only the same basic conventional and standard elements found, of necessity, in every modestly priced home, i.e., as their expert opines, "a conventional array of rooms and spaces, predictably arranged and consistent with housing alternatives seen in housing markets across the country for many years," and that substantial differences exist. (Defs' Opening Br. at 11,

Docket #46). The plaintiffs, however, argue that substantial similarity exists because of the "overall flow" and locations of rooms, hallways, bathrooms, access points and closets are substantially similar" in both the plaintiffs' and defendants' designs. (Pls' Opp. at 16, Docket #65).

A finding of substantial similarity does not require that an infringing work be a "virtual copy" of a protected one. Nor is the sine qua non of substantial similarity whether an ordinary observer would "confuse" the two works in their entirety. Rather, substantial similarity is determined by asking "'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression by taking material of substance and value.'" *Wildlife Express*, 18 F.3d at 509 (quoting *Atari, Inc.*, 672 F.2d at 614). The test is rooted in a decision authored by Judge Learned Hand more than fifty years ago. Judge Hand wrote that two works are substantially similar if "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960) (quoted in *Wildlife Express*, 18 F.3d at 509).

But "[w]ho is the 'ordinary' observer, and how does this person choose the level of generality?" *Nash v. CBS, Inc.*, 899 F.2d 1537, 1540 (7th Cir. 1990) (Easterbrook, J.).

> Ordinary observers, like reasonable men in torts, are fictitious characters of the law, reminders that judges must apply objective tests rather than examine their own perceptions. They do not answer the essential question: at what level of generality? After 200 years of wrestling with copyright questions, it is unlikely that courts will come up with the answer any time soon, if indeed there is "an" answer, which we doubt.

*Id.* This test requires a side-by-side comparison of the works. *Wildlife Express*, 18 F.3d at 506 n.1.

The defendants have provided substantial evidence regarding the numerous ways in which their designs differ from the plaintiffs' designs. Defendants' expert, Robert Greenstreet, has summarized the differences between the plaintiffs' designs and the defendants' designs as follows.

> When collectively assessed, a comparison of the Design Basics' models to those created by Roberts reveals many differences. In addition to differing room dimensions and overall square footage, there are further examples of different design features in each of the sets of drawings compared. These range from differences in the plan layouts, where rooms are in differing juxtapositions to the alleged "original"…, to variations in overall massing of the homes caused by contrasting roofing configurations…, building footprints and overall different building sizes…. There are also many indications of the use of different building materials, particularly on the exteriors of the compared models, which change the appearance of the homes…. In addition, many examples can be found of differing building details, such as windows, porches, garage doors and other details around doors and eaves.…

> The many differences in square footage, individual room dimensions, building massing, roofing configurations, building materials and building details . . . support the conclusion that none of the models of Design Basics and Roberts listed at issue are substantially similar. To the extent that Design Basics' comparisons attempt to claim substantial similarity, any such similarities exist only at the level of standard, traditional and non-original elements and their arrangement, not a the level of any creative, original expression.

(Robert Greenstreet Report at 7-8, Docket #48-2).[10] The defendants contend that, based on the laundry list of differences they have identified, no reasonable jury could possibly find the defendants' designs to be substantially similar to the plaintiffs' designs.

The plaintiffs, on the other hand, submit evidence from an employee, Carl Cuozzo, opining that the works at issue are substantially similar in too many ways to have been the product of independent creation. (Pls' Opp. at 16, Docket #65). Mr. Cuozzo alleges that the plans at issue are substantially similar because the "overall flow and location of rooms, hallways, bathrooms, access points and closets are substantially similar in both plans." (PPFF ¶ 20).[11]

The parties both rely on language in *Zalewski,* where the court granted summary judgment for the defendant on the issue of substantial similarity. 754 F.3d at 107. As such, the Court finds it important to distinguish *Zalewski* from this case. In *Zalewski,* the court found that most of the similarities between the plaintiff's and the defendant's homes were "features of all colonial homes, or houses generally." *Id.* at 106. Specifically, the defendant included evidence in the form of treatises on the basics of colonial architecture, *Id.* at 106 n.20, and the Court found that "given the constraints of a colonial design, [the differences were] significant. *Id.* Beyond the similarities, the Court found that the "layouts [were] different in many ways"

---

[10]The expert report also contains detailed lists of all the primary differences between the plaintiffs' works and the defendants' allegedly infringing works. (Docket #48-2 at 21-36). The Court finds it imprudent to list every single difference.

[11]The plaintiffs provide a detailed list of all the similarities between the plaintiffs' and the defendants' corresponding designs. (Docket #64-4 at 1-12). Again, the Court does not find it useful to its analysis to specifically list each and every similarity.

and that the "exact placement and sizes of doors, closets, and countertops often differ[ed], as [did] the arrangement of many rooms." 754 F.3d at 107. In other words, the *Zalewski* court found most elements of the designs to be non-original and that the original elements were not infringed. *Id.*

On the other hand, the facts of this case are distinguishable from *Zalewski.* That is because, most noticeably, in comparing the plaintiffs' and defendants' designs, the placement of rooms in nearly every configuration is almost identical. This is not the case where mere convention dictates that a dining room is typically next to a kitchen, and a master bath is next to a master bedroom. Indeed, for example, a side-by-side comparison of the plaintiffs' "Adair" plan (Docket #48-3 at 1) with the defendants' "Fox Hollow" plan (Docket #64-1 at 2) shows that the arrangement of every single room in the defendants' plan is nearly identical to the plaintiffs' design. Additionally, the placement of countertops, wet bars, and closets appears identical as well.[12] Although, as mentioned above, the plaintiff does not get originality credit for things such as functional consumer expectations and general house design, the exact arrangement of these features can be protectable. *See T–Peg, Inc. v. Vt. Timber Works, Inc.,* 459 F.3d 97, 110 (1st Cir. 2006) ("while individual standard features may not be individually copyrightable…the combination of such standard features may be copyrightable").

Moreover, this case is distinguishable because the designs in question are not of a particular style, such as the colonial style discussed in *Zalewski.* Presumably, the style of "conventional, modestly priced housing," which the

---

[12] A side-by-side comparison of all eight designs and their alleged infringing counterparts reveal similar comparisons in the arrangements and flow of the designs.

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 20 of 38   Document 83

defendants allege are present in this case, may require certain specific features; however, at this juncture in the case, it is not entirely clear what those features are. For example, the court in *Zalewski* found that the identical placement of the doors in the plaintiff's and defendant's designs did not show substantial similarity because a colonial style house specifically required a door centered at the front of the house. 754 F.3d at 106. In contrast, the defendants have provided no evidence of this type to support an argument that the "conventional, modestly priced" style of house requires the placement or the arrangement of features in any specific way.

Courts have found that "[w]here reasonable minds could differ on the issue of substantial similarity…summary judgment is improper." *Cavalier,* 259 F.3d at 112. Here, the Court finds that the similarities in the particular selection, arrangement, and combination of individual elements between the plaintiffs' and defendants' designs are sufficient to enable an ordinary, reasonable observer to find that the overall look and feel of the works is substantially similar. Although the defendants have pointed to numerous and identifiable differences, the Court nonetheless finds that the similarities weigh in favor of denying summary judgment. *See T–Peg,* 459 F.3d at 113–14 (holding that district court erred in focusing on differences and in failing to consider those similarities that went to the "overall form" of the building as well as the "arrangement and composition of spaces and elements"); *Sturdza,* 281 F.3d at 1299 (holding that, despite differences between the two designs, they were "sufficiently similar with respect to both individual elements and overall look and feel for a reasonable jury to conclude that the two are substantially similar").

Viewing the designs side-by-side, the Court finds that an ordinary observer, and a reasonable jury, could conclude that the designs are substantially similar with regard to the copyrightable elements. Accordingly, material issues of fact exist in this case to preclude summary judgment on the issue of substantial similarity. As such, the Court must deny the defendants' motion for summary judgement on the copyright claims, and the issue will proceed to trial.

### 3.2.3 Statute of Limitations—Date of Accrual

Copyright infringement claims are governed by a three-year statute of limitations. No action under Title 17 may be maintained unless it is commenced within three years after the claim accrued. 17 U.S.C. § 507(b).

The plaintiffs allege they did not discover the alleged copyright infringements until September 10, 2011. (Docket #1 ¶ 22). However, the plaintiffs claim the alleged infringement in this case began as early as August 2002. (PPFF ¶ 11). As such, the defendants argue that any claims for infringements prior to September 3, 2011, are time-barred by the statute of limitations. The principle inquiry here is when a copyright claim "accrues" for the three year statute of limitations to begin to run.

The Seventh Circuit recognizes that the discovery rule—that is, that the statute of limitations starts to run when the plaintiff learns, or should as a reasonable person have learned the defendant was violating his rights—applies to copyright. *Gaiman v. McFarlane,* 360 F.3d 644, 653 (7th Cir. 2004). The defendants nonetheless argue that the injury rule—that the statute of limitations begins to run when the infringing act occurs—should apply. The defendants argument is based on the language found in the Supreme Court's recent copyright case, *Petrella v. MGM,* __ U.S. __, 134 S. Ct. 1962, 1969 (2014).

The specific issue in *Petrella* was whether laches can serve as a complete defense to a copyright claim that is timely filed; the Court held that laches does not bar a copyright infringement claim filed within the three-year limitations period of § 507(b). *Petrella*, 134 S. Ct. at 1962. Relevant to the present case, the Court applied the injury rule (under which the statute of limitations is triggered when an injury occurs, even if a plaintiff is not aware of the injury) to determine when the plaintiff's copyright claim accrued. *See id.* at 1969 ("A copyright claim thus arises or 'accrues' when an infringing act occurs."); *id.* at 1972–73 (applying the rule). The defendants claim that *Petrella* overruled the Seventh Circuit's discovery rule and that, under the injury rule, "[a]ny claims for infringements occurring prior to September 3, 2011, are time-barred by the statute of limitations." (Defs' Opening Br. at 11, Docket #46).

Since *Petrella*, district courts in the Seventh Circuit have continued to apply the discovery rule, and have specifically declined to adopt the defendants' line of reasoning. For example, in *Frerck v. Pearson Educ., Inc.*, 63 F. Supp. 3d 882, 887 (N.D. Ill. 2014), the court stated that:

> the Supreme Court said "[a] copyright claim…arises or 'accrue[s]' when an infringing act occurs." 134 S.Ct. at 1969. Defendant takes this to mean that I should not apply the discovery rule in this case. Dkt. 138 at 1–2, Defendant's Notice of Supplemental Authority. I disagree. In *Petrella*, the Supreme Court explicitly said it was not passing on the question of the "nine Courts of Appeals [who] have adopted, as an alternative to the incident of injury rule, a 'discovery rule,' which starts the limitations period when 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Id.* at 1969 n.4. Since the Court did not take up this issue—and because I am bound to follow Seventh Circuit precedent—I will continue to apply the discovery rule.

*Id.*

Additionally, in this district, Judge Randa recently stated that: "Given the controlling case law of the Seventh Circuit Court of Appeals which is in accord with that of eight other courts of appeals, the Court declines the Defendants' invitation to delve into statutory interpretation." *Design Basics v. Campbellsport Bldg. Supply,* No. 13-CV-560, 2015 WL 1609144 at *18 (E.D. Wis. April 10, 2015); *accord Panoramic Stock Images, Ltd. v. John Wiley & Sons, Inc.*, No. 12–cv–10003, 2014 WL 4344095, at *7 (N.D. Ill. Sept. 2, 2014) (holding that *Petrella* did not abrogate this circuit's discovery rule).

This Court agrees with the reasoning of its sister courts, and recognizes that it is bound by the controlling case law of the Seventh Circuit. Until the Seventh Circuits holds otherwise, this Court concludes that the discovery rule is still the law of this circuit. Thus, the Court will apply the discovery rule to determine when the plaintiffs' claims accrued. *See Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614, 618 (7th Cir. 2014) (acknowledging that the Seventh Circuit "recognizes a discovery rule in copyright cases" and reserving the question of "whether *Petrella* abrogates the discovery rule in copyright cases").

4.    ACUITY MOTION FOR SUMMARY JUDGMENT

ACUITY, one of the defendants' insurers, seeks summary judgment extinguishing its duty to indemnify the defendants and, therefore, defend with respect to the allegations in this case. ACUITY argues that: (1) the initial grant of coverage is limited to injury arising out of copyright infringement in the defendants' advertisement of the Brookhaven plan; (2) that the "prior publication" exclusion in ACUITY's policy bars coverage of any injury arising out of the Brookhaven home in the defendants' advertising; and (3) in the alternative, if the Court determines that the "prior publication"

exclusion does not apply, its duty to indemnify should exclude the claim for willful copyright and violation under the DCMA.

The plaintiffs acknowledge that ACUITY's policies only provide initial coverage for the alleged copyright infringement arising out of the advertisement of the Brookhaven plan on their website beginning in 2002, and *not* for any of the other seven allegedly infringing plans. (Defs' Opp. at 3, Docket #59). As the parties agree, and it is undisputed that seven of the allegedly infringing plans were created four years after ACUITY's policy was terminated (ACUITY PFF ¶ 46), the Court need not address this issue any further. The Court now turns to ACUITY's policy to discuss the "prior publication" exception and whether it excludes coverage in this instance.

### 4.1    ACUITY Policy

ACUITY issued a policy of insurance to "J & V Roberts Inc." that contained Commercial General Liability ("CGL") Forms and Commercial Excess Liability ("Excess") Forms under Policy No. F72223 during the policy terms of: 4/27/01-4/27/02; 4/27/02-4/27/03; 4/27/03-4/27/04; and 4/27/04-4/27/05. (ACUITY PFF ¶ 22.) ACUITY is currently defending J & V and Roberts under a reservation of rights. (ACUITY PFF ¶ 25.) According to the ACUITY CGL Form, "Who is an Insured" for an organization other than a partnership, joint venture or limited liability company is the named insured (J & V Roberts, Inc.), and its executive officers, directors, and shareholders, but only with respect to their duties and liability as such. (ACUITY PFF ¶ 26).

The CGL Forms provided coverage for personal and advertising liability as follows:

SECTION I – COVERAGES

COVERAGE B – PERSONAL AND ADVERTISING INJURY
LIABILITY

1.      Insuring Agreement

a.      We will pay those sums that the insured becomes
legally obligated to pay as damages because of personal
and advertising injury to which this insurance applies.
We will have the right and duty to defend the insured
against any suit seeking those damages. However, we
will have no duty to defend the insured against any suit
seeking damages for personal and advertising injury to
which this insurance does not apply.…

b.      This insurance applies to personal and
advertising injury caused by an offense arising out of
your business, but only if the offense was committed in
the coverage territory during the policy period.

(ACUITY PFF ¶ 28).

The CGL Forms contained the following relevant definitions:

SECTION V – DEFINITIONS

1.      "Advertisement" means a notice that is notice that is
broadcast or published to the general public or specific market
segments about your goods, products or services for purpose
of attracting customers or supporters.

…

14.     "Personal and advertising injury" means injury,
including consequential bodily injury, arising out of one or
more of the following offenses:

a.      False arrest, detention or imprisonment;

b.      Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your advertisement;

g. Infringing upon another's copyright, trade dress or slogan in your advertisement.

(ACUITY PFF ¶¶ 32, 33).

Each of the CGL Forms contain a prior publication exclusion that the insurance does not apply to personal and advertising injury "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (ACUITY PFF ¶ 30).

The Commercial General Liability Coverage Forms are listed as an "underlying insurance" to which the Excess Forms apply. (ACUITY PFF ¶ 37). The Excess Forms contain an insuring agreement that reads as follows:

SECTION I – COVERAGES

1. Insuring Agreement

a. We will pay those sums, in excess of the amount payable under the terms of any underlying insurance, that the insured becomes legally obligated to pay as damages because of injury or damage to which this insurance applies, provided that the underlying

insurance also applies, or would apply but for the exhaustion of its applicable Limits of Insurance.…

b.       We have the right to participate in the investigation or settlement of claims or the defense of the insured against suits seeking damages because of injury or damage to which this insurance may apply.…

However, we will have no duty to defend the insured against any suit seeking damages for injury or damage to which this insurance does not apply.

(ACUITY PFF ¶ 34).

### 4.2    Legal Standard–Insurance Policy Interpretation

The parties are in apparent agreement that substantive Wisconsin law applies to the insurance issues arising from Design Basics' allegations that the Defendants infringed upon its copyrighted architectural works. In applying Wisconsin law, the Court generally applies the law of the Wisconsin Supreme Court. *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000). If, however, "the Wisconsin Supreme Court has not spoken on the issue," the Court must treat "decisions by the state's intermediate appellate courts as authoritative 'unless there is a compelling reason to doubt that [those] courts have got the law right.'" *Id.* (citations omitted). Moreover, if the Court is "faced with two opposing and equally plausible interpretations of state law, '[it should] generally choose the narrower interpretation which restricts liability, rather than the more expansive interpretation which creates substantially more liability.'" *Id.*

The interpretation of an insurance policy contract is a question of law for the Court. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65, 73 (Wis. 2004). The primary objective in interpreting a contract is to ascertain and carry out the intentions of the parties. *Wadzinski v.*

*Auto–Owners Ins. Co.*, 342 Wis.2d 311, 818 N.W.2d 819, 824 (Wis. 2012). Wisconsin state courts construe a policy as it would be understood by a reasonable person in the position of the insured. *Am. Girl*, 673 N.W.2d at 73.

The language of the policy determines the extent of coverage. *Soc'y Ins. v. Town of Franklin*, 233 Wis.2d 207, 607 N.W.2d 342, 345 (Wis. Ct. App. 2000). The policy's words must be given their common and ordinary meaning, and when the policy language is plain and unambiguous, the policy is enforced as written, "without resorting to the rules of construction or principles from case law." *Johnson Controls, Inc. v. London Market*, 325 Wis.2d 176, 784 N.W.2d 579, 586 (Wis. 2010). "[I]f the language of a policy is ambiguous, susceptible of more than one reasonable interpretation, [the Wisconsin courts] will construe it narrowly, against the insurer, and in favor of coverage." *Liebovich v. Minn. Ins. Co.*, 310 Wis.2d 751, 751 N.W.2d 764, 771 (Wis. 2008). "However, [Wisconsin state courts] do not interpret insurance policies to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *Am. Girl*, 673 N.W.2d at 73.

Insurance policy interpretation requires a three-step process. *Id.* First, the court must examine the facts to determine whether the policy's insuring agreement makes an initial grant of coverage. *Id.* Second, if there is an initial grant of coverage, the court is to examine the exclusions to determine whether any of them preclude coverage. *Id.* Third, the court looks to whether any exceptions to the applicable exclusions reinstate coverage. *Id.* The Court now turns to apply these principles to the "prior publication" exception in ACUITY's policy.

### 4.3    Analysis

The parties do not dispute that Wausau Homes published the Brookhaven plan in its plan book, American Dream Two Story Homes, in 2000. (ACUITY PFF ¶ 39). The parties also do not dispute that ACUITY's policy does not apply to personal and advertising injury "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." (ACUITY PFF ¶ 30). Thus, the only question for the Court to answer is whether the exception applies in this case as a result of the Brookhaven publication in 2000. ACUITY argues that based on the plain language of the policy, any advertising injury arising out of the Brookhaven plan is excluded from coverage because it was first published in 2000, well before the beginning of the policy period. The defendants argue in turn that the exclusion does not bar coverage because it does not apply when the prior publication was by an unrelated third party.

Because Wisconsin courts have not interpreted and applied the "prior publication" policy exclusion, the Court looks to other jurisdictions for persuasive authority. *See State v. Frey*, 178 Wis. 2d 729, 740, 505 N.W.2d 786, 790 (Ct. App. 1993). The Seventh Circuit has succinctly summarized the background of the "prior publication" exclusion:

> The purpose of the "prior publication" exclusion (a common clause in liability-insurance contracts, though rarely litigated) can be illustrated most clearly with reference to liability insurance for copyright infringement. Suppose a few months before insurance began on October 7, 1997, the insured published an infringing book that it continued selling after October 6. The "prior publication" exclusion would bar coverage because the wrongful behavior had begun prior to the effective date of the insurance policy. The purpose of insurance is to spread risk—such as the risk that an advertising campaign might be deemed tortious—and if the risk has

already materialized, what is there to insure? The risk has become a certainty.

*Taco Bell Corp. v. Cont'l Cas. Co.*, 388 F.3d 1069, 1072-73 (7th Cir. 2004) (internal citation omitted.) The Seventh Circuit elaborated on this principle in *Capitol Indem. Corp. v. Elston Self Serv. Wholesale Groceries, Inc.*, 559 F.3d 616 (7th Cir. 2009), stating:

> In Taco Bell's copyright hypothetical, it is the wrongful act that triggers the prior publication exclusion. If the insured does not publish actionable material prior to the policy date, the prior publication exclusion will not apply, regardless of whether the insured publishes very similar material that is actionable after the policy inception.

*Id.* at 621 (applying Illinois law).[13]

The defendants' argument hinges on the above language that "[i]f the *insured* doe not publish…the prior publication exclusion will not apply." *Id.* (emphasis added). Although, given this language, the defendants' argument certainly sounds convincing, a closer read of the case suggests otherwise. *Capitol Indemnity* specifically analyzed whether the insured's prior publication barred coverage. *Id.* at 620. There is simply no analysis in the case, however, as to a prior publication by a third party and whether that outcome would be any different. As such, this language is not outcome determinative, and the Court turns back to examine the plain language of the policy.

The Seventh Circuit in *Capitol Indemnity* held that the "prior publication" exclusion policy language was clear and unambiguous so as to

---

[13]The policy language in Capitol Indemnity read: "Insurance does not apply to…'advertising injury' [a]rising out of oral or written publication of material whose first publication took place before the beginning of the policy period." *Capitol Indem. Corp.*, 559 F.3d at 620.

preclude coverage. *Id.* Here, the language in ACUITY's policy is nearly identical, and the Court agrees that the language is unambiguous and thus the Court need not look to the rules of construction or principles from case law. *See Johnson Controls* 784 N.W.2d at 586. The policy's language, "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period" (ACUITY ¶ PFF 30), says nothing about limiting *who* published the material before the beginning of the policy period, and it is not the Court's place to insert language in a contract that is not there. ("[C]ourts cannot insert what has been omitted or rewrite a contract made by the parties." *Columbia Propane, L.P. v. Wis. Gas Co.,* 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 85, 661 N.W.2d 776, 783 (Wis. 2003).[14]

It would be contrary to ACUITY's insurance policy to require that the defendants published the allegedly infringing material prior to the policy period. The plain language of ACUITY's policy requires only that the first publication of the allegedly infringing oral or written material occur prior to ACUITY's policy period, which, as here, it did when the Brookhaven plan was first published in the year 2000. As such, the Court will grant ACUITY's motion for summary judgment; ACUITY has no duty to defend or indemnify the defendants. [15]

_____

[14] If the parties wished the "prior publication" exception to apply only when the insured published materials prior to the beginning of the policy, they certainly could have written the policy that way. Indeed, as ACUITY points out, other "prior publication policies," such as Wilson Mutual's policies, include this exact language. (ACUITY Reply at 5) (noting Wilson Mutual language stating "oral or written publication of the same or similar material *by or on behalf of an insured* that took place prior to the policy") (emphasis added).

[15] Because the Court grants summary judgment for ACUITY, it need not address ACUITY's alternative argument related to the willful infringement exclusion.

5.      WILSON MUTUAL MOTION FOR SUMMARY JUDGMENT

Wilson Mutual acknowledges it has a duty to continue to defend in this case; however, it argues its indemnity is limited. Wilson Mutual requests the Court to declare that: (1) the Wilson Mutual policies do not provide coverage for the defendants' alleged infringement of the plaintiffs' Fenton plan; (2) the Wilson Mutual policies only provide coverage for the plaintiffs' copyright claims related to or caused by advertising and not for the plaintiffs' claims for alleged scanning, copying and/or reproducing design plans, creating derivatives in the form of two dimensional plans and fully constructed residences, advertising, marketing and/or selling one or more houses based upon copies or derivatives of their design plans, and violations of the DMCA; and (3) the Wilson Mutual policies from April 27, 2005, to October 27, 2010, do not provide coverage for the plaintiffs' claims for willful infringement or intentional violations of the DMCA. (Wilson Reply at 7, Docket #72). As the defendants agree that Wilson Mutual has no duty to defend or indemnify for the alleged infringement of the plaintiffs' Fenton plan (Defs' Opp. at 3, Docket #56), the Court need not dwell on this issue; thus, Wilson Mutual has no obligation to indemnify for the defendants' damages arising out of the Fenton plan.

The Court now turns to discuss the remaining two issues. The Court first notes that the same general legal standards apply to this insurance contract as those discussed above, *see* discussion *supra* Section 4.2, and thus, the Court need not repeat the standards.

5.1      April 27, 2010, to April 27, 2015 Coverage

Wilson Mutual seeks to limit its insurance coverage in specifying that its policies "only provide coverage for Design Basics' claims that Robert Holmes advertised or displayed Design Basics' copyrighted design plans."

(Wilson Opening Br. at 19, Docket #43). Specifically, it denies that its coverage provides coverage for "Design Basics' claims arising out of alleged copying and scanning of design plans, creating derivatives of design plans, constructing homes based on design plans, advertising and marketing homes (not plans) and violations of the DMCA." (Wilson Opening Br. at 19, Docket #43). Wilson Mutual argues this is so because these activities were not "connected to or caused by Robert Holmes' advertising, a requirement for coverage under the personal and advertising injury coverage." (Wilson Opening Br. at 19, Docket #43).

The defendants concede that for the alleged infringement prior to April 27, 2010, Wilson Mutual only has a duty to defend or indemnify the defendants for alleged infringement related to or caused by advertising and not for Design Basics' other copyright infringement claims. (Defs' Opp. at 4, Docket #56). They argue, however, that the Wilson Mutual umbrella policy from April, 2010 to April 2015, has different language that does not require a causal connection to advertising. (Defs' Opp. at 4, Docket #56).

Beginning April 27, 2010, and continuing through at least April 27, 2015, the language in Wilson's umbrella policy described its obligations to insureds as follows:

SECTION I – COVERAGES

A.      Insuring Agreement.

        We will pay on behalf of the insured the "ultimate net

loss":

        a.      In excess of the "underlying limit": or

        b.      *For an occurrence covered by this policy which is either excluded or not covered by the "underlying insurance"*; because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this

Coverage Form applies, caused by an "occurrence" anywhere in the world.

(Wilson Br. at 13, Docket #43); (Defs' Opp. at 4-5, Docket #56) (emphasis added). The broad scope of the coverage afforded by the umbrella policy clearly obligates Wilson Mutual to pay for an occurrence covered by the policy regardless of whether the occurrence is excluded from the underlying insurance. In other words, the umbrella policy not only provides excess coverage for occurrences covered by the underlying policy, it also provides coverage for occurrences that are not covered by the underlying insurance.

The umbrella coverage form has its own set of definitions separate and distinct from any definitions that may be found in the underlying insurance that defines "advertising injury" as that term applies to the umbrella coverage:

SECTION VI – DEFINITIONS

A.      "Advertising Injury" means injury arising out of one or more of the following offenses committed during the policy period:

1.      The publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy;

2.      *Infringement of copyright,* title or slogan; or

3.      Piracy or unfair competition or idea misappropriation.

(Wilson Opening Br. at 13, Docket #43; Wilson PFF ¶ 1) (emphasis added).

The court in *Design Basics LLC v. Campbellsport Building Supply, Inc.,* No. 13-CV-560, 2015 WL 1609144, at *1 (E.D. Wis. Apr. 10, 2015), recently addressed this very issue, and found that Wilson Mutual's umbrella policies did "not require that the infringement occur in the context of any advertising,

nor does the umbrella policy exclude coverage for advertising injury based on copyright infringement. *Id.* at *11. The court reasoned that:

> Wilson Mutual does not acknowledge that the definitions in its business policies and its umbrella policies are different, and that the umbrella policies include injury arising out of copyright infringement but do not include the additional requirements found in the underlying business policies that the infringement occur in the context of advertising or in the insured's own advertisement. The differing definitions in the two types of policies are the result of Wilson Mutual's drafting, and it bears the consequences of the language it chose.

*Id.* Here, the Court agrees with the above reasoning, and Wilson Mutual does nothing to distinguish it. Wilson Mutual initially ignored the case entirely, and in its reply argues only that it disagrees with the reasoning and that it intends to appeal the ruling once it becomes a final order. (Wilson Reply at 4, Docket #72). The language of the policy is clear, however, and Wilson Mutual bears the consequences of the language it chose.

Additionally, as the *Campbellsport* decision notes, the Court agrees that the case relied on by Wilson Mutual, *Krueger Int'l, Inc. v. Fed. Ins. Co.*, 647 F.Supp.2d 1024 (E.D. Wis. 2009), is distinguishable because the policy language included conditions not found here.[16] As such, the Court finds that the Wilson Mutual umbrella policies from April 2010 to April 2015 do not require a causal connection to advertising; thus, the Court will deny Wilson Mutual's motion for declaratory relief on this issue.

---

[16] The policy language at issue in *Krueger* was a follows: "We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that…results from the advertising of your products, work or completed work." 647 F. Supp.2d at 1028 (St. Paul policy).

### 5.2    Willful Infringement Coverage

Wilson Mutual's motion also requests, albeit in only three sentences, that the Court declare that Wilson Mutual does not provide coverage for the defendants' alleged willful infringement from April 27, 2005, to April 27, 2010. (Defs' Opening Br. at 22, Docket #43). Wilson Mutual's opening brief cites no facts in the record in support of this argument, nor does it cite to any legal authority. "Judges are not like pigs, hunting for truffles buried in [the record]." *United Sates v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *see also Corely v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."). As such, the Court finds that Wilson Mutual's argument is wholly undeveloped and, therefore, does not merit declaratory relief.

### 6.    CONCLUSION

In sum, the Court finds that: (1) the defendants' motion for summary judgment will be denied, as more fully described above, because material issues of fact exist as to the copyright claims; (2) ACUITY's motion for summary/declaratory judgment will be granted because the prior publication language precludes ACUITY's duty to defend/indemnify; and (3) Wilson Mutual's motion for summary and declaratory judgement is granted in part and denied in part, as more fully described above.

Accordingly,

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #45) be and the same is hereby DENIED, as more fully described in detail above;

IT IS FURTHER ORDERED that ACUITY's Motion for Summary Judgment (Docket #51) be and the same is hereby GRANTED, as more fully described above; and

IT IS FURTHER ORDERED that Wilson Mutual's Motion for Summary Judgment (Docket #42) be and the same is hereby GRANTED in part and DENIED in part, as more fully described above.

Dated at Milwaukee, Wisconsin, this 11th day of September, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:14-cv-01083-JPS   Filed 09/11/15   Page 38 of 38   Document 83